The next case we're going to hear today is General Assurance of America v. Overby-Seawell, and Mr. Evans, whenever you're ready, we'll hear from you. Thank you, Your Honor. May it please the Court, there are two real central issues, I think, to this appeal. First of all will be where was the last act necessary for Overby-Seawell's liability to attach? And the second is whether or not the contract was reasonably calculated to protect a legitimate business without unduly impairing public interest. And I think the answer to both of those questions will dictate a reversal. Let me ask you this. I sympathize with your choice of law issue. I don't quite know where the district court got what it said on that issue. It had twice earlier ruled the other way, and Judge Wilkinson's opinion doesn't dictate otherwise. But let me assume that Virginia law applies to the courts. Yes. Does it change anything? Yeah, it changes everything dramatically. I'm not sure. That's what I'm... Well, let me address that in two ways. First of all, I do want to confirm one independent fact, which is the way we know, and Judge Keenan, who participated in many of these decisions, is well aware, that it's where the last act necessary for liability to attach occurs. It's the last act necessary for a wrongful act, which happens to be in a tort case, injury. The effects of injury is what Judge Wilkinson was talking about. And I think the choice of law issue goes to the last act necessary to commit the tort. And there's always some injury has to be committed, and that's where the tort occurs. The damage is flowing from it, the effects of it, we don't look to that. Totally agree with you with this modification, which is it's the last event necessary to make the actor liable. The key word is event, not act. And the reason that's important, for example, in the fraud cases is reliance is not an act by the actor. Reliance is an act by the recipient. And we know, for example, in the Playtex case, where the product was bought in Tennessee, it was the injury that occurred. We know that injury occurred, where the injury occurs, then dictates the choice of law for every tort except for the business conspiracy statute. To answer my question, which is, we have torts of interference and appreciative fiduciary duty and those types of torts. What's the difference under the law of the two states? Well, I think that the difference that Judge Ellis, remember Judge Ellis applied law that nobody argued, was to literally take North Carolina cases that said the mere existence of a relationship without more is not enough to establish a fiduciary relationship. Well, Virginia doesn't say anything differently. As a matter of fact, it's a good question whether Virginia, when you have a contract, recognizes any independent tort for fiduciary duty. Well, first of all, let me take those two questions separately. First of all, in fairness, North Carolina is exactly the opposite of Virginia on whether or not fiduciary relationships arise out of either principal, agent, or employer-employee. In North Carolina, the answer is no independent fiduciary relationship arises by virtue of just unique to the relationship, whereas in Virginia, the law is that the fiduciary relationship absolutely does attach simply by virtue of the relationship. So in fairness, it makes a big difference in that regard. In Florida, you have to have some acceptance of the fiduciary duty in addition to the existence of the relationship. We have evidence of that in this record where Mr. Overby, at his deposition, repeatedly confirmed that he understood that he had undertaken this commitment, that he understood that the only protection his licensees had was his commitment to fulfill that obligation. So we meet the Florida test, but it is a different test, and so it really does make a difference. In Virginia, this is automatically a jury case on every one of those counts. Take tortious interference for instance. We have two corporations that enter into a contract, a business negotiated contract for services provided, and you're saying a fiduciary relationship arises out of the fact they entered into that contract? No, I'm saying that there are two. One is that there is a relationship by virtue of the contract, and separate and apart, Mr. Overby testified eight times that he undertook a separate commitment to his licensees that was separate and apart from any contractual relationship, and that was that he would never use their information to compete against them or to solicit their customers. He had a confidentiality provision, and he had a non-solicitation provision. No, Your Honor, he said himself it was separate and apart. That's his language. His language was it was separate and apart. It was different, and I'll give you his joint appendix 1422 to 1423. I cross-examined him and asked him repeatedly because they were actually making at that time a different argument. They were making a merger argument, which is that somehow this merged into the license agreement. Unbeknownst to me, he would then testify because he was so afraid of that argument that no, I undertook a fiduciary commitment, and I asked him about fiduciary, the word fiduciary. Do you know what it means? Probably yes. What does it mean to you? It means I won't use the information against them to get their customers. Did you undertake that? Did he explain how he took it? Was that in signing the agreement? No, he said it this way. Only your client has a confidentiality agreement. Every one of my other licensees do not. I undertake it to all of them, including yours. I'm trying to hear my question. My question is how did he undertake the separate agreement? What mechanism? They separate and depart by communicating it repeatedly to the licensees, he said. Orally? Orally, repeatedly told them, and he in fact acted that way. How was it any different, this alleged separate agreement, from the contractual obligations that he had entered into? Well, it was much broader. In what respect? In this respect, which is he basically said, this was my question, Judge Keene, I said, your licensees are vulnerable to you. You have their most secret and important information. What protection do they have? What protection do they have? And he said the protection they have is my commitment, my relationship. It's separate and apart. It is the way I do business. It is the reason they should do business with me. I said, do you understand? You're actually now arguing a separate contractual relationship, an oral relationship, based on a commitment that he made, I guess. No, I am not arguing for a separate. You just argued for a separate agreement. What's your theory? My theory is a separate fiduciary relationship that was separate and apart, not a separate contract. A fiduciary relationship arises out of a contract. Not necessarily, Your Honor. I'm an attorney. Tell me where it doesn't. Well, to example, attorneys routinely don't have engagement contracts or contractual documents with clients, and we have a fiduciary relationship where routinely there are escrow agents. Escrow agents have a fiduciary obligation. And this is where Virginia law makes. That's a common law relationship. You're exactly. And how is there a common law relationship here based on the facts of the case? Because, as you know, Virginia says the way we test to see if this separate common law duty exists is does a party repose trust and confidence in another party that they're vulnerable to and that they have a reasonable expectation that they'll be protected. And that can exist. How long did that contract last for? It was terminable at will. Everybody agreed. Well, so you terminate the main written contract, and that one, what happens to that one? You terminate it as well. You could terminate a fiduciary relationship, Your Honor. So he'd have to make a separate call that I hereby terminate? All he had to do was say, I'm not, your clients are no longer off limits. From now on, I am going to compete with you. Because then they could have. It sounds to me like what he was testifying to, he was trying to suggest that when he entered into that contract with them, that it was meaningful because he stood behind it, and he would protect because he had confidentiality relationships and he had non-solicitation, and you can count on me for doing it. But without that written contract, this other one wouldn't stand. There's no consideration. There's nothing for it. No, there's absolutely consideration. Well, first of all, what you just said is 180 degrees contradicted by the record, and that is he said all of the licensees, including General Assurance, are protected, and no other licensee has this written agreement, but they're nonetheless protected. And what was it, the consideration that Oberby Sewell got? They got business. They got literally, it's okay, I'll give you my deepest secrets. Did you sue on this oral arrangement? I'm sorry? Did you file a separate suit on this oral arrangement, a separate count? We filed a breach of fiduciary duty count based on the fiduciary relationship, which exists separate and apart, and I would cite to the court the combined insurance versus Weist case and the prefab Steele versus Stevens case, both of which make it very abundantly clear that, in fact, separate and apart. Remember, in Weist, you had an employment contract, and the question was could you sue the employee for both breach of the employment contract for trying to steal customers and separately sue the employee for breach of fiduciary duty? Could you do that in the same lawsuit? And what did the court say? Absolutely. And that's what we did here. And so the fact of the matter is, is that both the record and the law make clear exactly what I've said here. I would make one other point, only because I think it's critically important that I want to give you a citation and then I want to turn my time to the standard in Georgia for dealing with the contract, and that is I do want to give you two record citations because I think it's important. Both of the contracts that got terminated here, provided they could only be terminated upon receipt by General Assurance in Virginia, and that is Joint Appendix 1059 and Joint Appendix 773. That idea that it could only be terminated, in other words, the last event necessary to create liability could only occur in Virginia, in fact, was also applied by the United States Supreme Court in Max Schell versus Schell Oil Products Oil. There was an argument whether or not franchisees could bring a cause of action for termination of their contract where they had renewed or had constructive eviction. And here's what the U.S. Supreme Court said. A franchisee that receives notice of termination has been terminated even though the termination date takes effect at a future date. The fact is it's upon receipt. Receipt occurred in Virginia. As Judge Keenan, as you know based on some of the opinion you participated in, it's that receipt that attaches liability creates the choice of law. And I would, so now let me just talk a little bit about the strict scrutiny standard that you applied to the contract. Having practiced in Georgia for about 30 years, we have concluded that in Georgia it's a famous joke, which is if you can't find a court of appeals decision to support your position, then you aren't a very good lawyer. So normally what I would suggest to the court is that the answer is, would be to certify the question over to the Georgia Supreme Court. But that was already done. That was done in the W.R. Grace decision. And then W.R. Grace decision, the court basically said what we need to do is, is this reasonably designed to protect a legitimate business interest? And they agreed that a legitimate business interest was customer contact information. Importantly in the W.R. Grace decision, there was no geographical limit and no other limit. And the case came over from the 11th circuit and said, will you uphold that contract? And the Georgia Supreme Court said, yes, there is no need for a territorial restriction expressed in geographic terms where you limit it to a finite group. Now here we have a finite group. The only customers protected are customers of General Assurance or those names that have been supplied by General Assurance. It is a finite group, which means it is finite in time. It is finite in scope. And the net effect of that is that it is reasonably limited. This is one very important point only because you can only get this flavor by having lived it as we have lived it in Georgia. There is no case where strict scrutiny has been applied in favor of a stronger party. There is no case where strict scrutiny has been applied in favor of a stronger party. And there is no question in this case that, in fact, the stronger party was over V. Sewell. If you think about it, normally the strict scrutiny cases are in favor of the licensee or in favor of the employee, rarely in favor of the licensor. Here, this operates to the benefit of General Assurance. Second, the question is whether there's consideration. Obviously there was consideration here. The consideration was that they got tens of thousands of dollars worth of premium in order to operate their business. The final point that I would like to make with regard to the record in this case is the other central question is if, as Judge Niemeyer has suggested, all of this was just cut apart and parcel of the contract, why the deception? Why the secrecy? We know, for example, at Joint Appendix 1030, that the CEO, notwithstanding the fact that he's admitted to a plan to steal customers, writes an email suggesting that nothing is going on to the President of General Assurance. He did that email again, did it on the following day, at Joint Exhibit Number 1431. If, indeed, all of this is above board, if it was contemplated by the parties, if, indeed, it's entirely above board, why would you effectively misrepresent and conceal your activities? And the reason is because they knew full well. They knew full well that what they were doing was illegal. Rarely, I would say never, have I ever had an opponent admit to a conspiracy in a plan. But as you saw from this record, we actually have the admission of the conspiracy. Thank you. Good morning, Your Honors. May it please the Court, my name is Kevin Fee, and I'm here on behalf of the Appellee Overby Sewell Company. Your Honors, this is a dispute about a one-page confidentiality agreement that GAA has tried to turn into various tort claims, including conspiracy, breach of fiduciary duty, and tortious interference with contractual relations. But throughout this case, GAA has overstated the implications of this agreement and relationship between the parties under Georgia law. Both GAA's contract claims and its tort claims arise from contacts between Overby Sewell and three banks. But it's undisputed that two of those banks to this day remain customers of GAA, and that the third customer was contacted by, the third customer is Yadkin Bank, and Overby Sewell was contacted by Yadkin Bank's service provider, Gil Swain, who had no relationship whatsoever with Overby Sewell at the time that the contact was made. Under these circumstances, and for many reasons discussed in our briefs, the District Court appropriately entered summary judgment in this case. I think it's important to note that this is not an instance where the judge just granted a summary judgment on a whim. There were three separate hearings where oral argument was held. The court examined six briefs in this case. He issued a decision granting partial summary judgment on two of these claims, considered a motion for reconsideration, then wrote a 35-page thorough opinion explaining his reasoning why summary judgment was appropriate. This is really GAA's third bite at the apple, really repeating all the same arguments that have been tried twice before and rejected by the District Court, and for the same reasons that the District Court rejected them, we suggest that summary judgment should be affirmed in this case. With respect to the torts, if Virginia law were to apply, what would be the implications? I don't think there's any implications with respect to that. If you just walk through some of these, I think it's undisputed initially that the contract claim is surely governed by Georgia law. But if we move on to the tort claims, for example, the breach of fiduciary duty, there I know are a lot of questions about, well, where is this fiduciary duty coming from? It's not in the written agreement, and then there's some discussion about oral promises, but that's not the subject of any claims in this case. And there's no suggestion or citation by GAA for any support in Georgia, North Carolina, or Virginia for the proposition that a fiduciary duty arises simply because two parties enter into a business arrangement or because they refer to each other informally as partners or anything of that nature. Your honors pointed out when a fiduciary duty arises, a principal-agent relationship, or in some instances maybe an employee-employer relationship, but there's no citations to any cases in the record that suggest a fiduciary duty is appropriately imputed in any state when it's just two parties dealing at arm's length who they admit had equal bargaining power at the time that the arrangement was entered into. And as a result, with respect to the fiduciary duty claim, it doesn't matter if it's Virginia law or not. The same really applies for the tortious interference claim. Really, all states require that there be some wrongful interference in order for there to be a tortious interference claim. And the only arguments that have really been made here about why the interference, to the extent there was any, was wrongful is because it either breached a fiduciary duty or breached a contractual obligation. Well, for reasons that we've described in our briefs and I've talked about briefly here already, there was no breach of contractual obligation or no breach of fiduciary duty. So to the extent there was any interference with respect to a contractual relationship between GAA and one of these three banks, it was not a wrongful interference. And finally, we have the conspiracy claim. And, you know, if Virginia law applies to the conspiracy claim, the statute requires that there be an agreement to enter into some course of conduct with the intent to injure the plaintiff. There is absolutely no record evidence suggesting that this arrangement between Overby Sewell and any of these brokers, either Gil Swaim or Securitas, were entered into for the purposes of harming GAA. In fact, all the evidence is exactly the opposite in what complies with common sense. They entered into these arrangements in order to get business and make money. It had nothing to do with trying to harm GAA, and there's no record evidence to support that notion. So for all those reasons and the many others we've described in our brief, I don't think there's any difference whether we're doing this under Virginia law, Georgia law, or Florida law, or North Carolina law, for that matter. And honestly, they haven't cited any notable differences in the case law in Virginia versus the other states in any event, in any of their briefs. So I do want to touch briefly as well on the breach of contract claim. There was a lot of discussion about whether or not strict scrutiny is appropriately applied to these restrictive covenants. And the district court correctly concluded that it should be subject to strict scrutiny. There are a couple instances where Georgia courts have allowed restrictive covenants to be examined under a lesser standard. The examples are if they're ancillary to the sale of a business, or they relate to a professional corporation or a professional services entity. There's no suggestion whatsoever that these restrictive covenants have anything to do with the sale of a business or a professional corporation. And there is not a single case that has been cited by any of the parties, either in this court or in the district court, that held a restrictive covenant that did not fall into one of those two categories to anything other than a strict scrutiny standard. We cited numerous cases that were analogous to the facts here involving franchise agreements and distributorship agreements where the Georgia courts have said restrictive covenants in those types of cases should be subject to strict scrutiny. And the district court correctly followed that line of cases. And if strict scrutiny is going to be applied to these restrictive covenants, they are unenforceable under Georgia law because they violate the Georgia laws, public policy, and the Constitution of Georgia. They are unlimited in time, and frankly, GAA doesn't deny that if they are unlimited in time, they're unenforceable. They instead suggest that you should read in some limitation to the agreement where none exists, either under the idea that the parole evidence should somehow contradict the writing itself or that it could possibly be blue-penciled under Georgia law. But Georgia law has continuously said that it will not blue-pencil any restrictive covenants governed by strict scrutiny analysis. It's also, I think, worth taking a minute or two to talk about whether or not there was solicitation in any event. You know, if this is enforceable, they still can't prove that there's a breach of this agreement. The Georgia cases that we've cited both below and here make clear that in order to solicit under Georgia law the party who's accused of soliciting must initiate the contact with the customer at issue. There is absolutely no evidence in this case to suggest that Overby Sewell initiated contact with any of the three banks at issue in this case. With respect to Yadkin Valley Bank, which is the only bank where they allegedly lost any business, it's undeniable that Gil Swain was working with Yadkin Valley Bank, pitched collateral tracking services of three other providers. Then only after those three pitches were rejected did he come forward with a proposal at the request of Yadkin Valley Bank to meet with Overby Sewell, and Overby Sewell then responded to that inquiry with a presentation. With respect to Capital City Bank, Securitas, who is the agent that was involved in that matter, had been doing business with Capital City Bank for almost a decade before this solicitation took place. And again, it was pitching the services of another provider way back in 2001 for collateral tracking services, a company called Life of the South. Only after Capital City Bank became dissatisfied with the services provided by GAA, did Capital City Bank ask Securitas to arrange a meeting with Overby Sewell to discuss collateral tracking services. So again, it was Capital City Bank initiating this discussion, not Overby Sewell. And finally, the third bank is Macon Bank, which has always been a bit puzzling because Overby Sewell has never met with Macon Bank, and there's no evidence in the record to suggest that Overby Sewell even asked Gil Swain to reach out to Macon Bank. So I don't understand how there could possibly be a solicitation in that case. There also hasn't been a breach of any confidentiality obligations. Throughout this case, we've been asking, what is the confidential information that was disclosed? And even after reading all the briefs of the other side to this date, I'm not exactly sure what it was. There is reference to information that was downloaded regarding revenues at Capital City Bank that the record evidence shows was done at the direction of counsel. And there's no evidence to suggest that that was ever used in any proposal with respect to Capital City Bank, or that the use of that information was somehow helpful in getting any business from Capital City Bank, because Overby Sewell still doesn't have any business from Capital City Bank sitting here today. Doesn't the tortious interference claim go away with respect to Macon Bank, because it remained a customer? Yes, Your Honor. And that's also true with respect to Capital City Bank. Capital City Bank remained a customer at least throughout the period of discovery leading up to the trial here. I don't know what the current status of that is, but what I can tell you is they're not a customer of Overby Sewell still. Now, Capital City Bank did give a notice of an intention to terminate, but at least as far as the record shows, as of the close of the record, they were still a customer as well. So I don't think there can be a tortious interference with a relationship that continues without any harm through the end of the evidence in this case. Now, I do also want to touch briefly on a comment that Your Honor made regarding whether or not you can even bring these tort claims under any law. All the obligations that are allegedly violated here are the result of the confidentiality agreement in this case. There's an argument that there were solicitations that were made that were improper. That duty to the extent it exists is the result of the contractual obligation. And there's a duty allegedly that was breached with respect to disclosing or using confidential information. Again, the subject of that confidentiality agreement. Under those circumstances, the courts of Virginia and this court have recognized that it's inappropriate for a party to be able to convert what really should be a breach of contract claim into various tort claims really for the purposes of seeking punitive damages or statutory attorney's fees and things of that nature. Surprisingly, even in the reply brief when we raised this issue, the only response that was made by GAA is that it wasn't a base of the district court's decision below and therefore you should not consider it on appeal. But as I'm sure all Your Honors know, you're able to affirm the judgment below on any basis that's supported by the record, and we suggest that that is supported by the record here. Notably, even the district court raised this issue but decided not to address it because there were so many other reasons to get rid of the tort claims. Now, finally, I do want to touch briefly on the choice of law issues. I know Your Honor has indicated some skepticism about whether or not that was done correctly in the district court below, and for the reasons I've said, I don't think that matters to the end result here. But I will say that I do think that there is an argument that could be made, and it is the correct argument, that the last act that took place in any of these instances that caused the liability was determination by the customer of its relationship with GAA. And those... The cases, I think, uniformly hold that under Lex Loci Delecti, which Virginia adopts, the last act necessary to create liability is injury in the case of a tort. And they have... We have noted in an opinion that the effects of injury you don't look at is where the injury occurred. And the district judge had written two opinions earlier which said exactly that. The place of the wrongful act is the place where the injury occurred, the last act necessary. And then he didn't cite his two prior cases that just... He distinguished between wrongful act and injury. But I think Virginia and everywhere else I know about has always included injury in the wrongful act because a tort has to have injury. Yes, certainly the tort has to have injury, but what I would suggest, Your Honor, is that the injury occurs when the customer decides to terminate the relationship with GAA. Well, that's another question. That's the factual question. I'm just talking about the analysis, and the judge seemed to distinguish wrongful act from place of injury, and I think place of injury is part of the wrongful act, and it may have just been a miswriting. But if, in this case, the wrongful injury was first sustained in North Carolina, then... Okay, well, then we may not have a big disagreement there, Your Honor. I do think that the record evidence in this case shows that the decisions to terminate the only relationship that was terminated in this case, the Yikon Valley bank relationship, was made in North Carolina, and therefore North Carolina law would apply. It sounds like even under the standard that you're describing, and there may not really be an issue except for maybe how things were worded by the district court as a result. So, unless Your Honors have any other questions, that's all I have. Thank you, Your Honors. If I were in the Congress, I would ask him to yield the balance of his time to me, but, Your Honor, first of all, let me apologize to you, Judge Deamer. I didn't listen carefully to your question, and I want to answer your question. And your question is, what difference does it make? And that's the question that I need to answer for you in a very direct way. And the answer to that question is, first of all, the Virginia business statute applies. The Virginia conspiracy statute applies, where you have an admitted conspiracy with an improper purpose for a goal of stealing clients after a commitment not to do so, and that commitment was made to licensees. That is the single biggest difference. The other biggest difference is tortious interference, where in Virginia, we know that by virtue of a relationship, whether it's employee or principal, agent, or otherwise, if you violate that fiduciary relationship... You have to take each violation, including the Virginia statute, and you have to analyze where the conduct or the wrongful act for that particular claim occurred. That's right. And my suggestion is, I was not intending to imply that the conclusion would be necessarily Virginia. I was suggesting that if the injury in a tort case, tortious interference, if injury occurred in Virginia, then it would be Virginia law. If injury occurred in North Carolina, it would be North Carolina law. But what we said in our opinion written by Judge Wilkinson was the effects of injury is not what we looked at. Correct. And in that opinion, he said the last injury occurred in that case in Maryland, and that's the place of the wrongful act. Right. And so the question now with respect to your statutory suggestion here, you would have to analyze that statute, look at the elements, and find out where the last act necessary to create a violation occurred. That's all exactly correct, and that's why the provision that says termination occurs only upon receipt in Virginia is controlling. It's why the Max Schell Corporation case in the U.S. Supreme Court that says termination is upon receipt is controlling. And, in fact, if you looked at the Milton case, which is the case you're referring to, in fact, there what happened was the employee went to Maryland and was terminated in Maryland, and the court said because he was in Maryland at the time, the termination was communicated to him. Maryland applied. If that termination had been communicated in Virginia, in other words, they went to him in Virginia, then it would have been Virginia. We know that consistently. So to your question, one, we know one big difference is the Virginia conspiracy statute. The two is tortious interference. And, Judge Hamilton, you raised a really good question, which is, well, doesn't that make Macon City Bank go away? And we know the answer to that question is no, because we know that the moment that the bank communicated to General Assurance that, in fact, they were being tampered with, they incurred additional expense to keep them happy. And we know from the Hill case, which is the other case cited by the appellees in this case, that the mere conspiracy alone is not enough. It is only whenever it is communicated to the target of the conspiracy that the injury occurs, that is, either termination of the contract or that they react to it. Conspiracy was me asking Mr. Overby, did you have a plan that was in concert with other people to steal your licensees' customers even after you had promised them all verbally and by your relationship not to do that? That was not the inadmissible statement. No, the inadmissible statement is a statement that says, a different employee said that Larry Overby told him he was going to put them out of business. Who were the members of the conspiracy? The members of the conspiracy were Mr. Overby, Overby Sewell, and then these agents that they brought on board. Now, Securitas and Swain. They didn't even know anything about this. Oh, not true, Your Honor. In fact, if you look, for example, Macon City Bank, they actually sent the email saying that Larry Overby wants to set up a meeting so that they can pitch their services, knowing Macon City Bank was a customer, and they wrote Capital City and said, he wants to be very careful here because he knows he's trading on thin ice. He needs you to send him an invitation so that he could come pitch you. Well, and the conspiracy has to, with respect to Macon and Capital, nothing occurred on that. The conspiracy would have to be related to... Not true. This is where Mac Schell's case is actually perfect because what Mac Schell said was, the question was, the tenants were holding over. They had been terminated, but they contended they were constructively evicted, and the court said, no, you can continue to be a tenant. You continue... In other words, Capital City can continue to be a customer, but if you've received the notice of termination, then termination has occurred, and as a result, Capital City has, in fact, you'll see it in the record, sent the termination. It basically makes them a tenant holding over at will. In fact, Yadkin Valley has sent the termination, and so we, in fact, under both the facts of this case and the law, have a termination, which is an injury which, by definition, had to occur in Virginia, and it was the target, it was the goal of the admitted conspiracy. And again, in 30 years, I've never had anybody actually admit that they had a plan. I want to clarify one thing, that either I misunderstood or you did. Sure. When I made the statement that GAA's tortious interference with contract claim with respect to Macon Bank went away, and I think that's correct because GAA, Macon Bank, stayed a client. No, Your Honor. Well, you don't challenge that on a bill. No, I think we do challenge that there was an ongoing business expectancy because there's actually, and I think... When they remained a client? Yeah, because the way it actually works in Virginia, and this is, again, Judge Niemeyer, where it's a difference, Virginia actually has, as Judge Koenig knows well, has this idea that if you have an expectation of an ongoing relationship unimpaired, that, too, can be interfered with because they have an expectancy component that's separate and apart from the contract itself. Thank you, Mr. Evans. Thank you so much. We'll come down and greet counsel and take a short break. This Honorable Court will take a brief recess. Thank you, Your Honor. Thank you. I appreciate it. There's a lot of clerks investigating. That's right. Nice to see you. Judge, thank you. Thank you.
judges: Paul V. Niemeyer, Barbara Milano Keenan, Clyde H. Hamilton